MOONEY et al. vs. COOLEDGE et al.

1. INJUNCTION: *Of trespass on land.*
A court of equity will enjoin the commission or continuance of a trespass on land, where the injury is irreparable, or of such a character that the damage cannot be estimated.

2. DEED: *Certainly requisite in an exception out of the thing granted.*
The same certainty of description is required in an exception out of a grant, as in the grant itself; and where a deed excepted out of the conveyance one acre of the land, and there was nothing in the exception, or evidence, to locate it upon any particular part of the tract, the exception was void for uncertainty, and the grantee took the entire tract.

3. ESTOPPEL: *When recital in a deed will not create.*
A recital in a deed that a part of the land described had been conveyed to another, inserted for the purpose of excepting such part out of the grant, but void for uncertainty, will not operate as an estoppel against the grantor, in a subsequent action to recover the land referred to in the recital.

4. ADVERSE POSSESSION:
Adverse possession, to constitute a bar to the assertion of the legal title by the owner of the land, must be actual, visible, open and notorious; It is not the particular use of land that is requisite, an adverse holding may be established by any acts and declarations that show a visible, open and exclusive possession; If one enters upon, sets apart, and asserts an exclusive right to, a plat of land as a family ·burial ground, for a series of years as deaths may occur in the family of himself or his friends, it will constitute an adverse holding; actual residence upon, or continuous occupancy in such a case is unnecessary, but where the possession is not under color of title, it will be confined to such parts of the land as is covered with graves.

APPEAL from *Phillips* Circuit Court in Chancery.
Hon. M. L. STEPHENSON, Circuit Judge.

*Rose and Palmer*, for appellants.

Estoppel is only coextensive with covenant. The mention of the acre reserved to Ferebee is only descriptive. *Kinnear* v. *Lowell*, 34 Me., 299 ; *Flagg* v. *Flagg*, 16 Gray, 175 . *Doane* v. *Wilcut*, id. 368 ; *Strong, J. in Sunderland* v. *Struthers*, 47 Penn. 411. Defendant had no interest in the recital, further than as descriptive. *Wallis* v. *Truesdale*, 6 Pick., 455 ; *Hill* v. *Epsley*, 31 Penn. S. R. 331 ; *Traum* v. *Heiffer*, 31 Ala., 136 ; *Brown, J. in Dezell* v. *Odell*, 3 Hill, 220 and cases cited. Estoppel does not extend to a collateral transaction. *Merrifield* v. *Parrott*, 11 Cush., 590 ; *Collins* v. *Tillow*, 26 Conn., 368 ; *Pelletreau* v. *Jackson*, 11 Wend., 110 ; S. C., 13 id. 189 ; *Hayes* v. *Askew*, 5 Jones, 63 ; *McComb* v. *Gilkey*, 29 Miss., 146.

On possession ; *Hicks* v. *Fluitt*, 21 Ark., 463 ; *Walker* v. *Towns*, 23 id., 147. Good at least against *tort feasers.*

Injunction the proper remedy. *Beattey* v. *Kurtz*, 2 Pet., 566.

*John J. Hornor*, for appellees.

No equity, because the bill states that appellees are in possession. *Miller* v. *Neiman and wife*, 27 Ark., 233.

Complainants, are estopped. Herman on Estoppel, pp. 13, 251.

No trust in Ferebee. 2 Wash. on Real Prop., 437, 447.

Complainants can claim no title on possession. *Sharp* v. *Johnson*, 22 Ark., 85 ; 3 Wash. on Real Prop., p. 114 ; *Doe* v. *Campbell*, 10 John, 477.

Exception in the deed was void for uncertainty. *Doe* v. *Porter*, 3 Ark., 18 ; 3 Wash. Real Prop., p. 371.

WALKER, J. :

The plaintiffs, as heirs of Henry F. Mooney, deceased, filed their bill in the Phillips Circuit Court against Cooledge and others, owners of Evergreen Cemetery, to have their title quieted to one acre of land, and to enjoin the defendants from removing

the bodies of the dead persons buried upon said acre of ground, and from making roads and thoroughfares on the same. The claim which the plaintiffs set up to this land is by descent, and by occupancy and adverse possession.

The defendants answered and denied the title and possession of plaintiffs, and set up title in one Fleetwood Hanks to said lands.

The case was heard upon bill, answer, exhibits and depositions, and a decree rendered in favor of defendants, from which plaintiffs have appealed.

The defendants contend that the plaintiffs, by their bill, show defendants to be in possession of the land in dispute, and claim to be the legal owners thereof, and if entitled to redress, they should seek it by an action at law, not in equity.

As a general proposition, the party who sues to remove a cloud upon his title should put himself in possession of the land. If out of possession and holding the legal title, he should sue in ejectment for possession, or in trespass for ordinary damages sustained. But there are exceptions to this rule, one of which is, that where the damages threatened, or being done, are irreparable, or where, from the nature of the injury, no just estimate of damages can be ascertained, the party receiving or threatened with such injury may, by a bill in chancery, restrain the act of trespass or violence threatened.

We think the facts stated in the bill bring the case clearly within this exception.

The plaintiffs allege that this acre of land was, and for many years had been, the property of their ancestor, and had all the while been claimed and used as a family burial ground; that many of their near relatives and esteemed friends were buried there; that defendants, the owners of Evergeen Cemetery, have extended the cemetery upon this land, fenced it in, laid off part

of the lands upon which their dead relatives and friends have been buried as an addition to said cemetery ; had given notice to them to remove the remains of their dead relatives and friends, and were threatening to do so.

For such an injury as this there could be no standard by which to estimate the damages sustained. The extent of the injury to be inflicted must depend upon the sympathies and feelings of the parties injured, and their peculiar views as to the sacredness of the spot where the remains rest. Whilst it might be a matter of little moment to some, it might inflict an irreparable injury to others, which money could not compensate. Under the state of case presented, we think that the suit was properly brought in a court of equity.

The plaintiffs claim title to this property as heirs of Henry F. Mooney, and they also claim that by a continued, uninterrupted, adverse possession for more than thirty years, they have acquired a valid title to the land.

We will first consider the validity of the title claimed by defendants.

It appears that Henry F. Mooney, under whom title is claimed, was, in the year 1835, the owner of a tract of one hundred and forty-seven acres of land near Helena, Arkansas, and on that day, that he conveyed the same by deed to Milliner Hanks, Fleetwood Hanks and George W. Ferebee. The land sold is described in the deed as follows : "Bounded on the east by the Mississippi river, on the north by a tract of land belonging to William Mooney, on the west by the public surveys, and on the south by a tract of land owned by them the said M. Hanks, Fleetwood Hanks, and George W. Ferebee, being that part of a tract of land originally containing 640 acres, which was confirmed to, and patented in the name of, William H. Glass, which he, the said Henry F. Mooney inherited from his father, the late Daniel Mooney, deceased, and containing about

146 acres. The number of acres which fell to the share of said Henry F. Mooney being about 147 acres, and one acre of the same, to include the graveyard and burial ground, having been previously deeded to him,·the said George W. Ferebee, to be by him forever kept as a burial ground. The aforesaid number of about 146 acres remaining."

This is the description given, and these the boundaries given of the tract sold, and upon a fair consideration of which, there can be no doubt but that Henry F. Mooney intended ·to convey only 146 acres, leaving out one acre, which he says he had before that time conveyed to Ferrebee to be kept as a graveyard. It is but fair to infer, too, that a graveyard spot had been selected, and that persons had already been buried in it, and, to this extent, the evidence is conclusive.

But there is nothing in the language of the reservation, nor in the evidence, to locate this acre of ground upon any particular part of the 147 acre tract, and whilst the evidence most clearly shows that this burial ground was claimed by Henry F. Mooney as his, and was frequently used for that purpose, for the interment of members of his family, and by request also several friends, and perhaps, occasionally by strangers without his permission, there is nothing shown to give this spot a location upon the tract sold. It was not inclosed, no monuments, no boundary lines, in fact nothing to identify the spot so selected, except the graves dug, and the interments made upon it, with nothing whatever to indicate upon what part of the 147 acre survey it was situated.

The copy of a survey purporting to have been made by a surveyor and filed as an exhibit was of recent date, since Evergreen Cemetery was inclosed, and seems to commence on a line of the cemetery, has no established or known place of beginning, which had an existence when the spot was selected as a burial

ground, and, so far as shown, was not made under an order of court, or upon notice to defendants, or other claimants of adjoining lands.

Under this state of facts the survey was not competent evidence for any purpose.

. The object of the descriptive part of a grant, says Washburn, is to define what the parties intended, the one to convey, the other to receive. Washburn on Real Property, vol. 3, p. 333.

That the grantor intended to except out of this grant, an acre of land, including his family burial ground, is clear enough. In order to effect this purpose, it was necessary to define its location, to identify it, so that it might be known upon what part of the tract this acre was to be taken.

In the case of *Doe* v. *Porter*, 3 Ark., 18, it was held by this court, that in all conveyances the grantor must describe the thing granted with sufficient certainty to ascertain its identity.

In the case of *Hughes* v. *Streeter*, 24 Ill., 647, the land was described as "a part of eighty acres containing seventy-four acres more or less." This was held insufficient, was so indefinite that the land could not be located.

In the case of *Laflin* v. *Harrington et al.*, 16 Illinois, 304, "a deed for twelve acres of a tract of land described by metes and bounds, was held invalid for want of certainty in the description of the land intended to be conveyed."

In the case of *Shackelford* v. *Bailey*, 35 Illinois, 391, a deed for thirty-four acres out of a certain tract, was held to be void for uncertainty in the description of the land intended to be conveyed.

These examples may suffice to show the extent to which the courts have gone in their decisions under the rule which requires, of the parties contracting, to describe "what the one intended to convey and the other to receive."

The same certainty is required in making the exception, as in the deed itself.

· If the grantor wishes, says Mr. Washburn, to except anything out of what he may in general terms have granted, as an exception is the taking of something out of the thing granted, which would otherwise pass by the deed, it may be said in general terms that it ought to be stated and described as fully and accurately as if the grantee were the grantors of the thing excepted, and the grantor in the deed made the grantee by the exception.

The exception will be found to contain all the uncertainty found in either of the cases cited, and because of such uncertainty in locating the acre of land intended to be excepted, we must hold it void.

And thus there is left an acre of land within the limits of the general grant, which was never intended to be sold by the one party, nor bought by the other, nothing ever paid for it. To whom does this acre belong? The exception being inoperative and void, did the one acre remain the property of Mooney, or did it under the general grant pass with the balance of the tract to the grantees.

An exception, says Mr. Washburn, must be a part of the thing included in the grant, and to be taken in substance out of that, and differs in this respect from a reservation. But in case the exception is made in the granting part of the deed (which was the case in this instance) it is not to be taken as an exception out of the thing granted, but as excluding of such part from the grant altogether.

The effect, says Mr. Washburn, page 370, in such a case, in respect to the thing excepted is, as if it never had been included in the deed. But as in this case, as we have seen, there was no valid exception, because no definite description was given of the

tract to be excepted, and nothing by which it could be identified or made certain, the whole estate passed by the grant to the grantees. They got a legal title to one acre of the land which they never intended to purchase, and for which they paid nothing, an acre of land which they insist that plaintiff's ancestor conveyed to George W. Ferrebee, and which plaintiffs are estopped from denying by force of the recital of the fact in their deed.

As regards the question of estoppel, and whether it did or not exist, from the view which we have taken of the case, is not material, because, if we give to the recital its full effect, the fatal omission remains, the question is still unanswered as to where this acre of land lay.

But should this not be the case, and if we take the recital to refer to a valid deed, one which cured this defect, this, was at best but part of the description of the land intended to be conveyed. It was no part of covenant of sale, it was a limitation upon the quantity sold, not a covenant of title.

An estoppel is founded on the idea that a man shall not defeat his own act, or deny its validity to the prejudice of another. 3rd Washburn on real property, 68.

Even admissions of fact, to amount to an estoppel, must be made to influence the conduct or to derive a benefit to another, which it would be contrary to good morals afterwards to permit the party making them to deny. Id. 94.

Now when we apply these rules to the case under consideration, it will at once be seen, that this recital of a previous sale of one acre, was in no respect prejudicial to the rights of the grantees. It was not made to prejudice their rights to the property sold, or intended to be conveyed. It did not relate to the title of the grantor, nor to his covenants or warranty of title, nor could it in any way have influenced their conduct, in the

purchase, whether the recitals of a previous sale were true or false, and notwithstanding they were made, the plaintiffs were not by any rule of good morals estopped from contradicting them. The truth is, that the defendants have been pressing this question of estoppel, for the purpose of fixing the title to the one acre of land, in dispute in Ferrebee, when in fact the legal title was in themselves.

Holding, as we must, that the exception was inoperative and that the acre of land in dispute passed under the general grant to defendants, we are brought to consider, whether by a continued uninterrupted possession of the land adversely to defendants, plaintiffs have acquired a title to the property.

This is a question of fact, to be determined from the acts and declarations of those claiming title by possession, as well as those who claimed to hold the legal title.

Uninterrupted for the requisite period of time, the assertion of a right of exclusive ownership, followed by acts consistent with such claim, on the one side, and knowledge of this claim, an acquiescence in it or a failure to disturb or question such possession on the other, are all proper circumstances to be considered, in determining the validity of the claim thus asserted.

Plaintiffs in their bill assert, and the defendants deny the existence of such facts as are necessary to confer title by possession.

Plaintiffs in their amended bill aver that they can find no conveyance of the one acre tract to Ferrebee, and that in fact they believe that no such conveyance was ever made, and that Ferrebee never did at any time, set up or assert any claim to the acre of land, and that if in fact such deed was made, it was in trust.

This amendment in no respect bettered the plaintiffs' case.

But in addition to this, they charge that their ancestor did not sell, nor did he intend to sell, this one acre of land, but desired to retain it as a family burial ground. That, for generations the

remains of their ancestors, and friends had been buried there. That from the time of the purchase by Hanks and Ferrebee in 1835, from Henry F. Mooney, he continued to exercise ownership and control over said acre of ground, and to bury members of his family thereon, and frequently gave permission to other persons to bury their friends and relatives thereon. That from the date of his deed to Hanks and Ferrebee, until within about two years ago, no person claimed any ownership over said acre of land, or in any way sought to interfere with their ancestor in his life time, or plaintiffs, his heirs, since his death, in its use or possession.

To these allegations defendants reply: That Henry F. Mooney, on the 9th of March, 1835, sold to Hanks & Ferrebee his entire interest in the tract, but it would seem that these general terms were only intended to extend to 146 acres, as in another part of the answer defendants insist that the one acre tract was conveyed to Ferrebee, and that although no deed may be found of record, a deed for the land was executed. Defendants admit that before the execution of the deed in March, 1835, there was a burial ground on the land conveyed to Ferrebee, but that it was held and owned by Ferrebee, not Henry F. Mooney. They deny that Henry F. Mooney, after the sale to Hanks & Ferrebee, ever exercised any ownership or control over the acre of ground. That no particular acre was designated, but there was, and for many years before had been, a public burial ground on the land without reference to the ownership of it. They admit that part of Henry F. Mooney's family were buried there, but deny that he gave permission to others to do so. That before the opening of Evergreen Cemetery, it was the custom of the country to use vacant private property for the burial of the dead, without permission. They charge that for years this acre of land was enclosed and held adversely to the claim of Mooney

by William Russell and Benedict Knott, and others; deny that Mooney exercised control over this land, paid taxes on it, or did any act indicating ownership.

Thus it will be seen that whilst the fact that there was a burial ground, on which part of the Mooney family were buried, as well as others, at the time Mooney sold to Hanks and Ferrebee, they insist that at that time this acre of land in fact belonged to Ferrebee, and was his, and not Mooney's property, and deny that Mooney or plaintiffs, ever after such sale, made any claim, or asserted any acts of ownership upon it, and thus the issue of title by possession is distinctly presented.

To sustain this issue the plaintiffs have taken the depositions of several witnesses, upon a careful consideration of which the following state of the case is made :

That this tract of land for many years had been owned by plaintiffs' grandfather, Daniel Mooney, and afterwards, by descent, came to their father Henry Mooney. That at an early date this particular spot on said tract had been selected as a family burial ground, and called and known as the Mooney family burial ground. That before the sale to Hanks and Ferrebee it had been so known and used, and it appears, too, from the reservation of one acre of land which had not been conveyed or intended to be conveyed by Mooney to Ferrebee, it was intended to be perpetually kept for that purpose, and although the act was not sufficient, because of its uncertainty of a precise location, to except it from sale under the deed to Hanks and Ferrebee, it is not the less, for that cause, competent evidence to show the intention of Mooney to retain it for that purpose.

Mary Anderson, a daughter of Henry F. Mooney, says: She was born in Phillips county, and raised there. In 1850, went with her father to the burial of her deceased brother; whilst at the grave yard her father told her that all of her relatives were

buried there, and that we would probably be buried there too, adding that my grandfather Mooney had selected that spot for the burial ground of the family. My father claimed this piece of ground, consisting of one acre, and it was used then as a burial ground, and so continued to be during my father's life. Grandpa, Daniel Mooney, grandma, Nancy Mooney, Aunt Missouri Mooney, Uncle Stewart Mooney, Uncle William Mooney, Wm. McAdoo, Grandma Mooney's second husband, John Russell, my father's half brother, and all of the family of Davis Thompson were buried on this piece of ground. So I was informed by my father, and that Thompson's family were buried there by his permission. I remember upon several occasions he refused to let persons be buried there. On one occasion I heard him refuse to let a Confederate soldier's remains be buried upon that acre of land, the soldier's name was Robertson, belonged to 21st Texas cavalry; he died at father's house January, 1863. Father then stated that it was his burial ground, and that if he permitted one soldier to be buried there, he would have to let everybody have the same right. I was at the burial ground on the 28th February, 1863, when our family were moving from Helena to the country. He told me that if he died before the war closed he wanted his remains buried there, and when on his death bed, he requested that when the war closed, and everything became quiet, his remains be moved to that acre of land, and buried with the deceased members of his family. My opportunities to be informed were good, and I never heard of any one having, or claiming to have, any right to this acre of land, save my father. It has been always known and called Mooney's grave yard. I never heard of the land being enclosed.

Arthur Thompson, a witness forty-six years of age, and thirty-two years a resident of Phillips county, deposed: My father moved to the place, north of Helena, of which Evergreen Cemetery is now part, in 1841, and lived there about thirteen years

with his family. When we moved to the place there was a burial ground (now part of Evergreen Cemetery), known as the Mooney burial ground; and it was understood that one acre was reserved as a family burial ground. Mooney, in his lifetime, frequently talked to my father and to myself about this burial ground, and told us that we could use it as our family burial ground, and my father, mother, and several of my sisters and brothers have been buried there, and a number of Mooney's family are buried there, besides a number of others, some without permission. I lived on the place for years. My opportunities to be informed were good. I do not know of any one having claimed particular control over it, except that Mooney claimed it as the Mooney family burial ground, by reservation, and authorized us to use it as our burial ground.

William Russell had this land sold under a mortgage, and afterwards sold it to B. J. Knott. I do not know that either of them ever claimed this acre in controversy.

Thomas H. Quarles deposed: I am forty-six years of age; lived in Phillips county since 1846; moved to what was called the Knott place, north of Helena, resided on that place until 1862; have resided in Helena since 1865. I am acquainted with the piece of land now inclosed in the Evergreen Cemetery, known as the Mooney family burial ground; have been acquainted with it since 1847, that being the year I moved on the Knott place. It was known to me, as well as the generality of old settlers at that time, to be the private burial ground of the Mooney family, and I have always believed and understood it was the property of H. F. Mooney, and that he had reserved it for a family burial ground. Mooney always claimed and exercised ownership over it. I never knew or heard of any one being buried on the acre of ground in question without the permission of H. F. Mooney. When William Knott was buried

there Mooney was asked for permission to bury him there, which was granted. The deceased members of Davis Thompson's family were buried there, as well as quite a number of Mooney's family. I never heard of any one else setting up claim to this land; was under the impression that Mooney owned four acres there.

My means of information were good. I was well acquainted with the acre of land, at one time being a partner in the ownership and cultivation of the original tract of land of which the one acre is a part, and which at one time was the property of Mooney. I never claimed or owned said acre of land. I always understood it to be the property of Mooney. B. J. Knott, William Mooney and myself were at one time the owners of the original tract of land deeded by H. F. Mooney to Hanks, et al., and at no time did either of us claim or pretend to own the acre of land reserved by H. F. Mooney for a family burial ground, it being claimed and owned by Mooney. I know that William Russell made a deed to B. J. Knott, et al., to the land, and I know Knott never claimed the Mooney burial ground, and I never heard of William Russell claiming it.

If B. J. Knott ever had any of the acre of land inclosed, it was a small portion on the east side of the acre. The fence run north and south near the graveyard, but I know that none of the graves of any of the Mooney or Thompson family were ever inclosed by B. J. Knott, but I heard Knott repeatedly say that he thought the fence inclosed a part of the reservation made by Mooney for a burial ground. I have heard Knott refuse persons the right to bury their deceased friends there, saying that it was Mooney's property.

This is the testimony touching the possession and claim of exclusive ownership over the land in dispute, and as the claim to title thus acquired is an unusual one, we have given the evidence in detail.

In view of which, the question arises, as to whether the adverse possession is such as to confer title on plaintiffs.

The adverse possession, required to constitute a bar to the assertion of a legal title by the owner of the land, must be an actual, visible, notorious, distinct and hostile possession. 3d Washburn on Real Property, 122.

The whole doctrine of adverse possession rests upon the presumed acquiescence of the owner.

It is not pretended by plaintiffs that the graveyard was inclosed or cultivated, or that there was an occupancy of it by residing upon it. But the proof clearly shows that long before the sale of the land in 1835, Daniel Mooney, the grandfather of the plaintiffs, then the sole owner of the tract of which this graveyard was a part, selected this spot as a family burial ground, after which time he and many other members of his family were buried there.

This tract of land passed by descent to his son Henry, who continued to claim and use it as a family burial ground, and with a view, as the acts of the party show, of more effectually setting it apart and dedicating it to that sole purpose, conveyed it to George W. Ferrebee, to be held by him for that purpose; after this, in 1835, when Henry F. Mooney sold the land, he expressly excepted out of the sale this tract, and although the exception was not effective for that purpose, it shows what the intention of all the contracting parties were, and from that day forward, during the life of Henry F. Mooney, by acts and declarations, he used and appropriated it to the purpose for which it was set apart and intended. He did this openly and exclusively, as his property, and his right to do so was not questioned by those who acquired title under Hanks and Ferrebee, but, on the contrary, was admitted to be his. Quarles, one of the joint owners of the tract of which the acre claimed as a graveyard was a part, says,

that neither Knott nor himself claimed the graveyard lot; that when Knott was applied to for permission to bury a deceased person upon it, he refused permission to do so, saying that it was Mooney's family burial ground, not his; after this, when Knott died, he was buried there by the permission of Mooney obtained for that purpose.

It is not the particular use made of the land, or whether built upon and used as a residence, or cleared and cultivated as a farm, but the exclusive use and adverse possession may be proven as well by other acts and declarations, which show a visible, open and exclusive possession and use of the land.

Shall we say that one who enters upon, sets apart and asserts an exclusive right to a plot of land as a family burial ground, who, from year to year, for a series of years, as death in his family occurs, or when the members of a friend's family die, buries them on that spot, and erects monuments to mark the spot of interment, that these acts are less open, adverse and exclusive evidence of possession, because from the nature of the use, it is neither necessary nor agreeable for him actually to reside upon the spot of such interments? We think not. Because, as we have remarked, it is the open, exclusive, continuous use and occupation, no matter how, which puts the real owner of the land upon his peril to assert his claim of title or lose the land. Washburn says: "Neither actual occupation, cultivation nor residence is necessary, where the property is so situated as not to admit of any permanent, useful improvement, and the continued claim of the party has been evinced by public acts of ownership. * * * That much depends upon the nature of the situation of the property, and the use to which it can be applied, or to which the owner or occupant may choose to apply it." 3 Washburn Real Prop., 134.

In thus holding, we think the evidence fully sustain us, and that the case comes fully within the spirit of the rule, most certainly within the equities of the case made.

If this occupancy had been held under color of title, the occupancy of any part of the tract for the required time would have conferred title to the limits of the grant under color of which the entry was made ; but in this case, the adverse possession can not be said to be under color of title to this acre of land. No deed giving limits or boundaries to this spot was ever made, and when an entry is made under such circumstances, the rule is that the possession reaches no further than there is an actual occupation by some defined, certain limits, indicated by an enclosure, or something of a like notorious character.

There can be no doubt but that it was the intent of Mooney to extend his claim of title to one acre, embracing the graves of his relatives and friends, but in fact his occupancy is only over the land covered with graves, made either by his ancestors and other relatives, or others by his direction and with his assent. To this extent there was both use and occupation, but no further. And whilst this use and occupation is abundantly shown, there is not such evidence of the extent of the land within the limits of an acre, so actually used and appropriated, as to give to the plaintiffs the relief to which we think them entitled.

Being, as we must hold, entitled to relief, the court below should have directed the master, or have appointed a suitable commissioner, to hear proof, ascertain the extent of the ground occupied for burial purposes by the Mooney family, or of others with their permission, within the limits of one acre, to lay off the same by metes and bounds, in such convenient shape as may be found most convenient and appropriate, and, upon this report, to have rendered its decree quieting the title of plaintiffs to the lands, directing the fencing placed upon it to be removed, and perpetually enjoining the defendants from entering upon the land so

ascertained and set apart, or removing the remains of the dead interred upon it.

Let the judgment and decree of the court below be reversed and set aside, the cause remanded, with instructions to cause the land, so used and occupied, to be identified and set apart, and a decree rendered in favor of plaintiffs in accordance with law, and not inconsistent with this opinion.